IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        )
                                )
            v.                  )        Criminal No. 00-54
                                )
DAVID MAIS                      )

**GOVERNMENT'S OMNIBUS RESPONSE
TO DEFENDANT'S PRETRIAL MOTIONS**

AND NOW comes the United States of America, by its attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Gregory J. Nescott, Assistant United States Attorney for said District, and respectfully submits the government's response to the defendant's pretrial motions.

The defendant has filed the following motions:

I.   Motion for Discovery

II.  Motion for a Bill of Particulars

III. Motion to Disclose and Exclude Uncharged Misconduct Evidence

IV.  Motion to Dismiss for Prejudical Pre-Indictment Delay

V.   Motion to Dismiss Indictment for Violation of Defendant's Right to Due Process, Defendant's Right to a Speedy Trial, And for Being Placed Twice in Jeopardy

The government now responds to each motion.

I.  <u>MOTION FOR DISCOVERY</u>

Several of the defendant's pretrial motions relate to discovery requests under Rule 16 of the Federal Rules of Criminal Procedure.  Before responding to each of these requests, the government will briefly discuss the law in regard to pretrial discovery generally.

The law is well-settled that "[c]riminal pretrial discovery is, of course, vastly different from discovery in civil cases." <u>United States v. Ramos</u>, 27 F.3d 65, 67-68 (3d Cir. 1994). "In contrast to the wide-ranging discovery permitted in civil cases, Rule 16 of the Federal Rules of Criminal Procedure delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." <u>Id</u>.  <u>Accord</u>, <u>United States v. Casseus</u>, 282 F.3d 253, 257 (3d Cir. 2002) (affirming district court's denial of defense request for disclosure and interview of eyewitness/anticipated government trial witness; "[I]t is clear that a criminal defendant does not have the right to full discovery of the government's case.").

The United States accepts its obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), Rules 12 and 16 of the Federal Rules of Criminal Procedure, and the Jencks Act, 18 U.S.C. § 3500.  Further, the United States

2

is willing to cooperate with any reasonable request by the defendant.

The government notes, however, that its obligation to make available pretrial discovery materials is governed primarily by Rule 16 of the Federal Rules of Criminal Procedure. That rule requires the government to produce certain categories of information upon request of the defendant: 1) the defendant's statements that are in written or recorded form (including grand jury testimony) and any oral statement given by the defendant to a person then known by the defendant to be a government agent (Rule 16(a)(1)(A)); 2) the defendant's prior criminal record (Rule 16(a)(1)(B)); 3) all documents and tangible objects within the possession, custody or control of the government which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant (Rule 16(a)(1)(C)); 4) results or reports of physical or mental examinations or other types of scientific tests in the government's possession which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial (Rule 16(a)(1)(D)); and 5) a written summary of expert testimony the government intends to use during its case in chief at trial (Rule 16(a)(1)(E)).

Under <u>Brady v. Maryland</u>, <u>supra</u>, and its progeny, the

government also has the obligation to disclose exculpatory evidence
-- evidence that is favorable and material to the defense.
Strictly speaking, Brady "'is not a discovery rule, but a rule of
fairness and minimum prosecutorial obligation.'" United States v.
Starusko, 729 F.2d 256, 262 (3d Cir. 1984) (citation omitted).

> Exculpatory evidence includes material that
> goes to the heart of the defendant's guilt or
> innocence as well as that which might well
> alter the jury's judgment of the credibility
> of a crucial prosecution witness. Evidence
> impeaching the testimony of a government
> witness is exculpatory when the credibility of
> the witness may be determinative of a criminal
> defendant's guilt or innocence. If the
> exculpatory evidence "creates a reasonable
> doubt" as to the defendant's culpability, it
> will be held to be material.

Id. at 260 (citations omitted). See also United States v. Bagley,
473 U.S. 667, 682 (1985) (Evidence is "material" when it is
reasonably probable that, "had the evidence been disclosed to the
defense, the result of the proceeding would have been different.")
Brady material must be disclosed "in time for its effective use at
trial." United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983),
cert. denied, 464 U.S. 1048 (1984). Accord, United States v.
Presser, 844 F.2d 1275, 1283 (6th Cir. 1988).

The United States is unaware of the existence of any
directly exculpatory Brady material pertaining to the defendant.
Should such material be discovered, it will be provided to the
defense upon receipt.

The Jencks Act, 18 U.S.C. § 3500, requires the government

to provide the defense with statements of witnesses that the government intends to call at trial. The Jencks Act protects discovery of such witnesses' statements, however, "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). <u>See also</u> <u>United States v. Ramos</u>, 27 F.3d at 68; <u>United States v. Campagnuolo</u>, 592 F.2d 852, 858 (5th Cir. 1979); <u>United States v. Horsley</u>, 621 F. Supp. 1060, 1067-68 (W.D. Pa. 1985), <u>aff'd</u>, 831 F.2d 286, 288 (3d Cir. 1987); <u>United States v. Fischbach & Moore, Inc.</u>, 576 F. Supp. 1384, 1393 (W.D. Pa. 1983). The Third Circuit has held that a defendant's right to a fair trial is "fully protected" if <u>Brady</u> material relating to the credibility of government witnesses is disclosed "the day that the witness testifies." <u>Higgs</u>, 713 F.2d at 44.

The United States acknowledges, however, that strict adherence to the dictates of the Jencks Act could cause delays at trial. Therefore, the government will voluntarily turn over Jencks Act materials one week prior to trial, to ensure that unnecessary interruptions or delays are avoided.

Outside of the aforementioned statutes, rules, and case law, a defendant has no general constitutional right to pretrial discovery. <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977). Those rights conferred by statute, rule, and case law cannot be used to compel the United States to disclose the minutia of its evidence, trial strategy, or investigation. <u>United States v. Fiorvanti</u>, 412

5

F.2d 407, 411 (3d Cir.), <u>cert</u>. <u>denied</u>, 396 U.S. 837 (1969).[1]  Thus,

<u>Brady</u>, Rule 16, and the Jencks Act should be construed as limits on

discovery, within which limits the trial court may exercise its

discretion.  <u>See</u> <u>United States v. Randolph</u>, 456 F.2d 132, 136 (3d

Cir.), <u>cert</u>. <u>denied</u>, 456 U.S. 132 (1972); <u>Fischbach & Moore, Inc.</u>,

576 F. Supp. at 1393 (<u>Brady</u> is not a discovery device); <u>United

States v. Deerfield Specialty Papers</u>, 501 F. Supp. 796, 819 (E.D.

Pa. 1980) (pretrial discovery rules are not meant to permit

"fishing expeditions" into government case files); <u>cf</u>. <u>United

States v. Adams</u>, 759 F.2d 1099, 1111 (3d Cir.) (discovery is within

the discretion of the district court), <u>cert</u>. <u>denied</u>, 474 U.S. 906,

971 (1985); <u>United States v. Liebert</u>, 519 F.2d 542, 548 (3d Cir.)

(defendant's discovery demands must be reasonable), <u>cert</u>. <u>denie</u>d,

423 U.S. 985 (1975).

The defendant here seeks pretrial disclosure of

information that goes well beyond the types of discovery permitted

in federal criminal cases.  The United States now responds to each

of the requests in the Motion for Discovery as follows, with each

---

[1]  <u>Accord</u> Fed. R. Crim. P. 16(a)(2) **Information Not Subject
to Disclosure** ("Except as provided in paragraphs (A), (B), (D),
and (E) of subdivision (a)(1) [of Rule 16], this rule does not
authorize the discovery or inspection of reports, memoranda, or
other internal government documents made by the attorney for the
government or any other government agent investigating or
prosecuting the case.  Nor does the rule authorize the discovery
or inspection of statements made by government witnesses or
prospective government witnesses except as provided in 18 U.S.C.
§ 3500.").

response corresponding to the letter the defense has assigned to its request:

a.    The government acknowledges its obligations under Brady and its progeny to provide all statements favorable to the defendant.  No such statements are presently known to exist. Should such statements be discovered, they will be provided to the defense before trial.

b.    Should the government learn of the names and/or addresses of any witness favorable to the defense, it will provide defense counsel with that information.

c.    The government will provide any Brady impeachment documents within the Jencks materials, one week prior to trial.

d.    The government will provide notice of any and all promises or benefits made to its witnesses within the Jencks materials.

e.    The government will provide notice of any prior contradictory statements relevant to this case, of which it has knowledge, within the Jencks materials.

f.    The government, as outlined earlier, will provide any exculpatory matter prior to trial.  However, the demand for "a list of cases and investigations in which a prospective Government witness, or an informant in this case whom the Government does not intend to call as a witness, has acted as a

7

cooperating individual and the location and identity of any criminal filing resulting from that cooperation" is far outside the scope of Rule 16, and should be denied.

g.    The government presently does not intend to attempt to introduce and attribute to the defendant the statements of any non-testifying co-conspirator at trial.

h.    This request is outside the scope of Rule 16, and should be denied.   Names of trial witnesses may not be disclosed before trial, as discussed fully above.   Such witness lists will be provided with the Jencks materials.

i.    A request for "negative exculpatory statements" is beyond the scope of Rule 16, and should be denied.   The government again acknowledges its obligations under <u>Brady</u> and its progeny, and will provide exculpatory evidence, if found.

j.    The government will provide all such impeachment evidence of which it is aware.

k.    The government will provide rap sheets for its trial witnesses within the Jencks materials.   The requests for the criminal records of informants, unindicted co-conspirators, and any other non-witnesses is beyond the scope of Rule 16, and should be denied.

l.    The government has already given notice to the defense, at arraignment, of all electronic recordings, etc. in this case, and provided copies of all tapes made.

II.  <u>MOTION FOR A BILL OF PARTICULARS</u>

The defendant now seeks a bill of particulars, demanding, *inter alia*, that the government state when the defendant joined the conspiracy; times, dates, and places for each overt act; and the names and addresses of each member of the conspiracy.

This request is wholly without merit, and should be denied.

The Third Circuit has recognized that a trial judge must be given broad discretion in deciding whether or not to grant a Bill of Particulars.  <u>United States v. Rosa</u>, 891 F.2d 1063, 1066 (3d Cir. 1989); <u>United States v. Neff</u>, 212 F.2d 297, 309 (3d Cir. 1954).  In <u>Rosa</u>, 891 F.2d at 1066, the Court explained that broad discretion is necessary

> . . . in order to strike a prudent balance between the defendant's legitimate interest in securing information concerning the government's case and <u>numerous</u> countervailing considerations ranging from the personal security of witnesses to the unfairness that can result from forcing the government to commit itself to a specific version of facts . . . See <u>United States v. Tarvers</u>, 833 F.2d 1068, 1076 (1st Cir. 1987); <u>United States v. Cole</u>, 755 F.2d 748, 760 (11th Cir. 1985); <u>United States v. Arenal</u>, 768 F.2d 263, 268 (8th Cir. 1985) (emphasis added)

Case law has established that a bill of particulars is <u>not</u> to be used by defendants as a general discovery tool.  <u>United States v. Anderson</u>, 799 F.2d 1438, 1441, (11th Cir. 1986), <u>cert. denied</u>, 480 U.S. 931 (1987); <u>United States v. Warren</u>, 772 F.2d 827,

837 (11th Cir. 1985), cert. denied, 475 U.S. 1022 (1986); United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981); United States v. Litman, 547 F. Supp. 645, 654 (W.D.Pa. 1982). Therefore, it should only be granted when an indictment is so vague that it fails to advise the defendant of the charges of which he is accused. United States v. Andrus, 775 F.2d 825, 843 (7th Cir. 1985); United States v. Addonizio, 451 F.2d 49 (3d Cir. 1972), cert. denied, 405 U.S. 936 (1972); United States v. Steinmetz, 643 F. Supp. 537, 539 (M.D.Pa. 1986); United States v. Bloom, 78 F.R.D. 591, 599 (E.D.Pa. 1977); United States v. Smith, 405 F. Supp. 144, 146 (E.D.Pa. 1975).

There are only three purposes for which the federal appellate courts have found a Bill of Particulars necessary. See United States v. Warren, 772 F.2d 827 (11th Cir. 1985), cert. denied, 475 U.S. 1022 (1986); United States v. Cole, 755 F.2d 748 (11th Cir. 1985); United States v. Long, 706 F.2d 1044, 1054 (9th Cir. 1983). The Court of Appeals for the Third Circuit in Addonizio clearly stated these purposes as: (1) to inform the defendant of the nature of the charges being brought against him so that he may adequately prepare his defense; (2) to avoid surprise at the trial; and (3) to protect against double jeopardy because of an inadequately described offense. Addonizio, 451 F.2d at 63-64.

Moreover, with respect to conspiracy charges, a Bill of Particulars should neither be utilized to compel the government to

10

provide dates, times, and places regarding the formation of a conspiracy, or to compel information concerning the manner in or date upon which any particular defendant allegedly entered the conspiracy. United States v. Butler, 822 F.2d 1191, 1193-1194 (D.C. Cir. 1987); United States v. Carroll, 510 F.2d 507, 509 (2d Cir. 1975), cert. denied, 426 U.S. 923 (1976); United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988); United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987); United States v. Payden, 613 F. Supp. 800, 817 (S.D.N.Y. 1985); Litman, 547 F. Supp. at 654; United States v. Boffa, 513 F. Supp. 444, 485 (D. Del. 1980). Likewise, the government should not be required to reveal the precise details of the roles that each defendant and his co-conspirators played in forming and executing a conspiracy. Butler, 822 F.2d at 1193-94; United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986), cert. denied, 480 U.S. 919 (1987); Litman, 547 F. Supp. at 654; Boffa, 513 F. Supp. at 485. As the Third Circuit stated in United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985), "A Bill of Particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation. [Citations omitted.] Rather, it is intended to give the defendant only that minimal amount of information necessary to permit the defendant to conduct his *own* investigation."

Finally, in ascertaining whether a Bill of Particulars is

11

necessary and appropriate, the Court may consider all of the information which has been provided to the defendant, not just the information contained in the indictment.  United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir.), cert. denied, 490 U.S. 914 (1972); Fischbach & Moore, 576 F. Supp. at 1389.  In so doing, the Courts have held a defendant is not entitled to a Bill of Particulars with respect to information already available through other sources. United States v. Vasquez, 867 F.2d 872, 874 (5th Cir. 1989); United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987); United States v. Rosenthal, 793 F.2d at 1193.

In this case, the defendant was provided with a copy of the indictment, in which he is charged in Count One with participating in a conspiracy to distribute and possess with intent to distribute in excess of 50 grams of crack cocaine, and in excess of 500 grams of cocaine.

The defendant has also been provided with a wealth of materials that plainly demonstrate to him the outline of the conspiracy, including numerous overt acts that are attributable to him.

The government will introduce evidence at trial that the defendant entered into this particular conspiracy months after his indictment in the Western District of North Carolina on March 6, 1996, at Docket No. 3:96CR42.  (A copy of that indictment is attached as Exhibit 1.)  The North Carolina indictment involved the

defendant's participation in cocaine importation and distribution conspiracies between the spring of 1994 and March 6, 1996 (the date the indictment was returned).  Those conspiracies collapsed by September 1995, when drug couriers attempting to smuggle cocaine into the United States from Jamaica were intercepted and arrested by U.S. Customs in North Carolina.

It was sometime after the collapse of those importation/distribution conspiracies that the defendant again began distributing crack cocaine in the Western District of Pennsylvania, utilizing new, unknown sources of supply.  Even though the earlier importation and distribution conspiracies collapsed by 1995, with the interception and arrests of numerous individuals, the government does not intend to introduce in the instant trial, as proof of the drug distribution conspiracy charged in Count One, evidence of drug distributions before March 6, 1996, the date of the North Carolina indictment.

Here, the government will rely on crack and cocaine sales the defendant made to a cooperating individual (CI) beginning around August 1996 and continuing until March 1997, to prove the conspiracy charged.

As stated earlier, the defendant has already received a great deal of material outlining the particulars of the conspiracy for him.  On June 23, 2006, counsel for the defendant received numerous detailed Pennsylvania State Police reports, outlining:

13

    \*    the defendant's receipt from the CI of a $2,000 payment owned Mais from an earlier delivery of approximately 1/2 kilogram of cocaine to the CI;

    \*    the controlled and tape-recorded delivery on February 20, 1997 of 9 ounces of crack for $5,000 from Mais to the CI; and

    \*    the arrest on March 6, 1997 of the defendant on the North Carolina indictment, and the search of two residences linked to Mais, with marked drug buy money and drug distribution paraphernalia being recovered.

Critically, the defense also received on June 26, 2006, a copy of an affidavit and search warrant executed on March 6, 1997 at 5500 Margaretta Street, Apt. 26, Pittsburgh, PA. The three-page, single-spaced affidavit details how and when the CI and Mais began a series of drug transactions in February 1997.

The defense was also provided, on July 3, 2006, with the following documents, all of which provide details of the charged conspiracy:

    \*    Reports of interviews of David Mais on March 6, 1997 (8:15 a.m.); March 6, 1997 (9:30 a.m.); April 16, 1997; May 1, 1997; May 20, 1997; June 16, 1997; and February 22, 1999.

    \*    An FBI report concerning observations made on March

4, 1997.

* Copies of recorded telephone conversations of the defendant on February 15, 1997 and March 4, 1997.

* Copies of recorded "body wire" tapes of the defendant on February 15, 1997; February 20, 1997; March 4, 1997; and March 5, 1997.

Additionally, counsel for the government met with the defendant and his previous counsel on September 5, 1997, and advised them both in detail of the evidence supporting the instant conspiracy charge against Mais.

Government counsel has also orally advised the defendant's present counsel of details concerning the outline of the conspiracy charge.

In light of the wealth of evidence already presented to this defendant, and considering the case law discussed above, the motion for a bill of particulars should be denied.


III.  MOTION TO DISCLOSE AND EXCLUDE
      UNCHARGED MISCONDUCT EVIDENCE

The defendant now seeks pretrial disclosure of any evidence of other crimes, wrongs or acts of uncharged misconduct the government may seek to introduce against the defendant at trial pursuant to Federal Rules of Evidence 404(b).

The government does not presently intend to seek to introduce evidence of the defendant's conviction in Westmoreland

County, Pennsylvania, on gun and drug charges in 1992.

Apart from evidence of other crimes that are part and parcel of the conspiracy between approximately August 1996 and March 1997, or evidence that will help to explain the relationship between Mais and testifying co-conspirators, the government does not presently expect to introduce any 404(b) evidence relating to other crimes outside of the conspiracy and, specifically, does not intend to seek to introduce any evidence of the defendant's prior arrests or convictions.

IV.   MOTION TO DISMISS FOR
      PREJUDICAL PRE-INDICTMENT DELAY

The defendant now seeks dismissal of the indictment "based on the prejudical delay between the time of the alleged events and the time of the return of the indictment."

In support of this motion, the defendant avers that the delay allowed the prosecution to gain tactical advantage over him because witnesses or records may have disappeared.

"To obtain a dismissal of charges on the grounds of pre-indictment delay pursuant to the Due Process Clause, a defendant must bear the burden of proving two essential facts: 1) that the government intentionally delayed bringing the indictment in order to gain some advantage over him, and 2) that this intentional delay caused the defendant actual prejudice." United States v. Ismail, 828 F.2d 153, 167 (3d Cir. 1987)(citing United States v. Marion,

16

404 U.S. 307, 325 (1971)).

A defendant must satisfy both prongs of the <u>Marion</u> standard "to invoke the extreme sanction of dismissal of the indictment." <u>United States v. Sebetich</u>, 776 F.2d 412, 430 (3d Cir. 1985).

The defendant readily acknowledges that he bears these burdens of proof, and suggests he will be prepared to do so at a hearing on this motion.

The government submits that there is no evidence of an intentional delay to gain a tactical advantage over the defendant, based on the procedural facts of this case as set out fully in Section V, immediately below, and that the defendant will, in any event, be unable to show actual prejudice.

Therefore, the "extreme sanction" of dismissal of the indictment is not warranted here, and the defendant's motion should be denied.

V.   MOTION TO DISMISS INDICTMENT FOR VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS, DEFENDANT'S RIGHT TO A SPEEDY TRIAL, AND FOR BEING PLACED TWICE IN JEOPARDY

The defendant now avers that the instant indictment returned in the Western District of Pennsylvania on March 28, 2000, violates the Double Jeopardy Clause of the Fifth Amendment, in that he was allegedly already prosecuted for the same conduct in the Western District of North Carolina, in an indictment returned on

March 6, 1996.[2]

The government admits that under <u>North Carolina v. Pearce</u>, 395 U.S. 711 (1976), cited by the defendant, double jeopardy occurs when a defendant is subjected to successive prosecutions for the same crime, or when the government improperly divides a single criminal conspiracy into multiple violations of one conspiracy statute. <u>Braverman v. United States</u>, 317 U.S. 49 (1942).

Neither of those prohibited acts occurred here, as discussed below, and the defendant's motion to dismiss for double-jeopardy violations should therefore be denied.

<u>FACTS</u>

On March 6, 1996, the defendant was indicted along with several other individuals in the Western District of North Carolina in an 11-count indictment, filed at Docket No. 3:96CR2 (Exhibit 1, attached).[3]

---

[2]The defendant additionally avers that his right to a speedy trial was violated here, but offers no support for that proposition.  This claim appears to be not sustainable, inasmuch as he waived extradition from Canada to the United States in May 2006, had his initial appearance in the WDPA on June 16, 2006, and was arraigned on June 23, with the time since excludable time, while the parties filed pretrial motions.

[3]At Count 1, David Mais, Tabon Clinder Howze, and David Gauland Smith were charged with conspiracy to possess with intent to distribute and to distribute a quantity of cocaine and cocaine base, from in or about the spring of 1994 and continuing to the present [March 6, 1996], in the Western District of North Carolina and elsewhere.  Co-conspirators named in that count included Leaford Owen Barnett, Deborah Peoples, Darcy Jerome

The indictment in North Carolina followed the arrests in North Carolina and Baltimore of Darcy Peoples and other drug couriers as they arrived on flights from Jamaica, carrying drugs, on September 1, 1995.

The defendant was arrested on the warrant for the North Carolina indictment exactly one year later, on March 6, 1997, in Pittsburgh.

---

Peoples, Horace Turner, Jimeatte Nichols, Patrick Beckford, and Mike LNU a/k/a Pinka, in violation of 21 U.S.C. § 846.

At Count 2, Mais, Howze, and Smith were all charged with the same seven named individuals [Leaford Owen Barnett et al.], during the same time period [spring 1994 - March 6, 1996], in the same venue, with conspiracy to import cocaine and cocaine base into the United States, in violation of 21 U.S.C. § 963.

At Counts 3-10, Mais and Howze were both charged with:

Count 3   Possession with intent to distribute cocaine and cocaine base, on or about September 1, 1995 (with Darcy Jerome Peoples)
Count 4   Possession with intent to distribute cocaine and cocaine base, on or about September 1, 1995 (with Deborah Peoples)
Count 5   Possession with intent to distribute cocaine and cocaine base, on or about July 15, 1995 (with Leaford Owen Barnett)
Count 6   Possession with intent to distribute cocaine and cocaine base, on or about August 17, 1995 (with Jimeattee Nichols)
Count 7   Importation of cocaine and cocaine base, on or about September 1, 1995 (with Darcy Jerome Peoples)
Count 8   Importation of cocaine and cocaine base, on or about September 1, 1995 (with Deborah Peoples)
Count 9   Importation of cocaine and cocaine base, on or about July 15, 1995 (with Leaford Owen Barnett)
Count 10  Importation of cocaine and cocaine base, on or about August 17, 1995 (with Jimeatte Nichols)
Count 11  Forfeiture

19

On February 11, 1997, Jaison Evans was arrested in the Western District of Pennsylvania with in excess of one-half kilogram of crack cocaine. He immediately agreed to cooperate, and named David Mais as his cocaine source of supply. According to Evans, when Mais returned from a trip to Jamaica in August 1996, he began supplying Evans with quantities of crack cocaine and powder cocaine.

Wearing a body recorder/transmitter and under law enforcement surveillance, Evans met with Mais on February 15, 1997 and paid him $2,000 that was owed from the half-kilogram seized by police four days earlier.

On February 20, 1997, Evans, wearing a transmitter, met with Mais at Mais' residence at 5500 Margaretta Street, Apt. 206, in Pittsburgh, and purchased an additional 9 ounces of crack cocaine directly from Mais. Evans paid Mais $5,000 in marked, serialized currency.

Additional recorded meetings and conversations between Evans and Mais were arranged, with surveillance officers observing at least one meeting between the men.

On March 4, 1997, Mais advised Evans that he was expecting a 10-kilogram cocaine shipment from his source of supply in Atlanta. At the same time, Evans paid Mais $1,000 for crack he had received in February.

On March 5, 1997, Evans paid Mais an additional $2,000

owed from an earlier crack delivery.  On that same date, agents in North Carolina faxed their 1996 indictment to Pittsburgh, asking agents here to arrest Mais on the outstanding arrest warrant.

On March 6, 1997, agents in Pittsburgh arrested David Mais on the North Carolina warrant at the home of his girlfriend, Pam Latimer, at 439 Sapphire Way in Pittsburgh.  In simultaneous searches at the Sapphire address and at Mais' apartment at 5500 Margaretta Street, #206, Pittsburgh, agents seized drug packaging materials, scales, diluents, pots used for cooking crack, and over $70,000 in cash, which included $7,690 of the serialized currency given by Jaison Evans to David Mais in previous days as payment for the crack cocaine sold by Mais to Evans.

When Mais was arrested, he told agents that he used to deal drugs but hadn't done so for a long time, and that he let people cook crack at the Margaretta Street apartment, charging $1,000 to those who wanted to cook up the cocaine there.

On March 7, 1997, Mais appeared before a magistrate judge in Pittsburgh for detention and removal hearings on the North Carolina indictment.  Mais was represented by Larry Victum, Esquire.  Following the hearing, Mais was ordered removed to the Western District of North Carolina to face the 1996 indictment there.

At this same time, Mais was advised through his counsel that he faced indictment in the Western District of Pennsylvania on

crack cocaine conspiracy charges, arising out of the 1997 sales he made to Jaison Evans. Mais indicated that he wanted to cooperate in the Western District of Pennsylvania, and desired to plead guilty to the North Carolina indictment, along with any new charges, in Pittsburgh.

To that end, his counsel filed a series of motions in the Western District of Pennsylvania, seeking to postpone Mais' removal to the Western District of North Carolina, while he cooperated here. Those motions were granted in this District on March 14, 1997, and June 25, 1997.

In the meantime, Mais sat for a series of debriefings with agents, accompanied on all but the first two by his counsel. The debriefings took place on March 6, 1997, at 8:15 a.m.; March 6, 1997, at 9:30 a.m.; April 16, 1997; May 1, 1997; May 20, 1997, when Mais' upcoming grand jury appearance in the Western District of Pennsylvania in August or September was discussed; and on June 16, 1997, when the discussion included the anticipated filing of crack cocaine charges here, once Mais entered a guilty plea to the North Carolina indictment, following its expected transfer to the Western District of Pennsylvania.

In these debriefings, Mais consistently offered information about Jamaican and non-Jamaican drug traffickers operating in the Western District of Pennsylvania, including several significant targets who were thought to be indictable with

22

Mais' cooperation and testimony.

On April 24, 1997, David Mais consented in writing to the transfer of the North Carolina indictment to the Western District of Pennsylvania for a plea, pursuant to Rule 20 of the Federal Rules of Criminal Procedure.  He also was discussing pleading guilty to an Information in the Western District of Pennsylvania on the Jaison Evans crack sales.

Mais signed a plea letter proffered him by the Western District of North Carolina on June 20, 1997.  That letter was returned to the Western District of North Carolina and filed there on July 1, 1997, along with the Rule 20 paperwork signed by Mais and the United States Attorneys for the Western District of Pennsylvania and the Western District of North Carolina, transferring his North Carolina indictment to Pittsburgh for a plea.

Under the terms of the plea agreement,

- Mais agreed to plead guilty to Count One of the North Carolina indictment (June 20 plea agreement, p.1).

- The parties agreed that Mais was responsible, for purposes of the Sentencing Guidelines, for at least 500 grams but less than two kilograms of cocaine hydrochloride (powder cocaine) (p.2).

- The United States Attorney in North Carolina agreed to recommend that any sentence Mais received on the Western District

of North Carolina indictment run concurrently with the sentence to be imposed in the Western District of Pennsylvania [on the Information to be filed].

- Mais agreed to provide certain cooperation to the United States.

David Mais' change of plea in Pittsburgh to the Western District of North Carolina indictment was scheduled for September 5, 1997, before the Honorable Gary Lancaster, and assigned Criminal No. 97-117.

On August 9, 1997, David Mais wrote a letter to the government, alleging he had been "misled into signing" the plea letter, and he was "not guilty of the charges" against him in North Carolina and wanted "the chance to face my accusers." (A copy of that letter is attached as Exhibit 2.)

On September 5, 1997, Mais and his attorney met with the undersigned Assistant United States Attorney and case agents, and Mais was asked what his intentions were concerning entering a guilty plea. Mais was advised if he wanted to end his cooperation and return to North Carolina to fight that indictment, negotiations were at an end; he would not be called before the grand jury in Pittsburgh, he would be returned to North Carolina, and he would later be indicted in the Western District of Pennsylvania in the Jaison Evans crack case. Mais responded that he did not want to cooperate any more, would not testify before a federal grand jury

in Pittsburgh, and did not wish to enter a plea of guilty to the North Carolina indictment, but wanted to return to North Carolina to fight it.

On September 5, 1997, Mais appeared before Judge Lancaster as scheduled for his change of plea on the North Carolina indictment that had been transferred to Pittsburgh. Mais advised the Court that he did not want to plead guilty. Judge Lancaster vacated the Rule 20 Consent to Transfer, and ordered the indictment and Mais returned to the Western District of North Carolina.

Without the cooperation of Mais, agents in Pittsburgh refocused their efforts on the Jamaican targets against whom Mais had proffered cooperation. Indictments and convictions against several of those targets resulted, albeit without the benefit of Mais' cooperation. After September 5, 1997, agents and the United States Attorney's Office for the Western District of Pennsylvania had no further contact with David Mais.

On February 26, 1998, an amended plea agreement for Mais was filed in the Western District of North Carolina.[4] On February 26, 1998, Mais entered a plea of guilty in North Carolina to Count

---

[4]The case docket in the Western District of North Carolina notes the filing of the "amended" plea letter. The government has not yet received a copy of that amended plea letter. The defendant's "Exhibit B", attached to his Motion to Dismiss, is an unsigned, undated letter that appears to be a copy of the original plea letter signed by Mais and his counsel on June 30, 1997 (the government has a signed copy of that letter), and does not appear to be the "amended" plea letter filed in North Carolina on February 26, 1998.

One of the indictment.  On October 28, 1998, Mais was sentenced to 41 months imprisonment in North Carolina.

Agents in Pittsburgh continued to work to prepare an indictment against Mais, and reviewed numerous wire transfers they believed were linked to his drug activities.  On February 22, 1999, agents visited Mais at the federal prison in Elkton, Ohio, and secured handwriting exemplars from him.  The results of the handwriting analysis were reported around July 13, 1999.

David Mais was indicted in the instant case by a grand jury sitting in Pittsburgh on March 28, 2000.  A detainer was sent to the Bureau of Prisons.  The government was then advised that Mais had been released from the Bureau of Prisons to an INS detainer.  Mais entered the United States illegally in 1988, and was arrested and released on bond in 1993 by Immigration authorities, pending a hearing.  When Mais failed to appear for his deportation hearing on March 30, 1993, he was ordered deported in absentia.  After the Bureau of Prisons released Mais to the INS detainer in 2000, Mais was deported back to Jamaica on March 23, 2000, five days before the instant indictment was returned.

When it was determined that Mais was no longer in custody in the United States, an arrest warrant was issued in the Western District of Pennsylvania for him.  In April 2006, Mais was arrested in Toronto, Canada, on that arrest warrant.  Following the filing of a formal request by the United States for a provisional arrest

warrant and the granting of that request, Mais was detained, pending extradition.  In May 2006, he waived extradition and was returned to the United States, where he had his initial appearance in the Western District of Pennsylvania on June 16, 2006.

## ARGUMENT

Based on the facts outlined above, the government submits that the Double Jeopardy Clause has not been violated here.  As admitted elsewhere in this brief, including in the government's response to the request for a Bill of Particulars, the instant prosecution will prove a conspiracy, involving David Mais, Jaison Evans and others, to distribute crack cocaine (and powder cocaine) in the Western District of Pennsylvania.  The government will prove this conspiracy began around August 1996, well after the end of the cocaine smuggling/importation/distribution conspiracy that collapsed with the interception of the drug couriers in North Carolina and Baltimore in September 1995, followed by the March 1996 North Carolina indictment.

The government will not seek to prove any crimes here within the conspiracy that would cause the defendant to "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V.

Although Double Jeopardy bars successive prosecutions for a single act, Blocksburger v. United States, 284 U.S. 299 (1932), the appellate courts have rejected such challenges in cases where,

for example, successive RICO prosecutions both involved murder but different patterns of racketeering activity (United States v. DeCologero, 364 F.3d 12 (1st Cir. 2004); successive prosecutions in a stolen cars conspiracy when the defendant left the conspiracy and then later rejoined the same conspiracy, because of separate and distinct acts within the single conspiracy (United States v. Asher, 96 F.3d 270, 273-74 (7th Cir. 1996); a prosecution for cocaine distribution was followed by a prosecution for a cocaine distribution conspiracy, based on two separate transactions, at different times, in different states (Murr v. United States, 200 F.3d 895 (6th Cir. 2000)).

    The defendant argues in his Motion to Dismiss that "an overlapping of information from North Carolina was improperly used in the instant indictment." (¶ 14). The Supreme Court has said that "a mere overlap in proof between two prosecutions does not establish a double jeopardy violation." United States v. Felix, 503 U.S. 378, 386 (1992).

    If a defendant is charged with two conspiracies containing overlapping proof, the courts look to the elements of the conspiracies charged, the overt acts charged, geographic location, timing, and participants to determine if the conspiracies are indeed the "same offense." See United States v. Bennett, 44 F.3d 1364, 1369 (8th Cir. 1995). Numerous Circuits have adopted this kind of totality of the circumstances test, and concluded that

prosecution for multiple conspiracies was not barred by due process. See, e.g., United States v. Smith, 82 F.3d 1261, 1267-1271 (3d Cir. 1996) (two conspiracies may exist despite similar locations and extensive overlap of time frames because co-conspirators not interdependent); United States v. Aquilera, 179 F.3d 604, 608 (8th Cir. 1999) (two conspiracies to distribute narcotics constituted separate offenses despite similar locations and overlap of time frames because significant number of co-conspirators were different); United States v. Cole, 293 F.3d 153, 158-59 (4th Cir. 2002) (no bar to prosecution for a Florida conspiracy, which covered 16 months and involved two drug distributions and two conspirators, and Virginia conspiracy, which spanned 10 years and involved more than 15 conspirators and the widespread distribution of cocaine).

Under a totality of the circumstances examination of the facts here, the North Carolina conspiracy was distant in time from the Western District of Pennsylvania conspiracy, with the North Carolina importation scheme effectively ending by September 1995, or no later than March 6, 1996, when the Western District of North Carolina indictment was returned, as contrasted with the instant conspiracy, which began around August 1996, when Mais returned to Pittsburgh from Jamaica; in overt acts, with North Carolina being a cocaine importation scheme using couriers, as contrasted with the 1996-97 conspiracy in the Western District of Pennsylvania

involving Mais' new source for cocaine in Atlanta, and Mais distributing cocaine base (crack) to Jaison Evans in Pittsburgh; in geographic location, with the Western District of North Carolina case built around North Carolina and Baltimore smuggling points for cocaine imported from Jamaica, as contrasted with the Western District of Pennsylvania case revolving around cocaine base sold by Mais to Evans in Pittsburgh, as supplied through Atlanta; and in participants with Mais being the only common participant in both the Western District of Pennsylvania and the Western District of North Carolina drug conspiracies.

In point of fact, there does not appear to be any overlapping in proof between the two prosecutions. The fact that Jaison Evans could testify that he was purchasing cocaine and crack cocaine from the defendant earlier in the 1990s would not be offered at trial as proof of any element within the instant conspiracy, but only as a way of explaining to the jury the nature of the relationship between the defendant and Evans, and how it was that Evans so easily began purchasing large quantities of crack from Mais after August 1996.

Lastly, the defendant raises three other points in support of his argument that there is a double jeopardy violation here. Each of the points is without merit.

The defense first suggests that the instant prosecution should be barred because the Western District of North Carolina

Presentence Investigation Report (PSIR) (a copy of which is attached to the defense motion) referred to the 1997 crack sales to Jaison Evans within the Offense Conduct Section (¶ 8) of the PSIR. This, it is argued, demonstrates a double jeopardy violation.

The reasoning is specious. The North Carolina indictment was handed up on March 6, 1996, nearly a year before the crack sales in Pittsburgh to Evans. The stipulation in the North Carolina case, according to the PSIR, was for 500 grams - 2 kilograms of cocaine (hydrochloride). So it is impossible to argue that conduct mentioned in the PSIR but occurring in another district nearly one year after the end of the North Carolina conspiracy - according to that indictment - and involving cocaine base (crack) rather than the cocaine hydrochloride (powder) stipulated to in North Carolina has any relevance to a double jeopardy analysis.

The defense also argues that the defendant will be unfairly punished here (¶ 12) if the indictment is not dismissed because David Mais has returned to family life in Jamaica. While that argument may be argued in mitigation (upon conviction) at sentencing, it should not be the basis for a motion to dismiss.

Finally, the defense argues (¶ 16) that the North Carolina plea agreement recommended that the North Carolina prison sentence run concurrent with the Western District of Pennsylvania sentence. Apart from the fact that the plea letter submitted by

the defense is apparently a copy of the letter signed by all
parties in June 1997 - before the defendant reversed his field in
September, refusing to plead to the charges in Pittsburgh or to
continue to cooperate or testify before the grand jury there - the
issue of concurrent time could be argued in mitigation (upon
conviction) at sentencing, but it can not be relied upon as a basis
for a motion to dismiss the indictment.  The moment that David Mais
confirmed to Judge Lancaster, on September 5, 1997, that he was not
willing to plead guilty and wanted to return to North Carolina to
contest the charges, he knew (1) that the Pennsylvania indictment
would carry potentially much heavier terms of imprisonment than the
North Carolina indictment, because the government had outlined for
Mais the evidence against him in the Pittsburgh case, and (2) that
he chose to return to North Carolina at that point, so he would
have to be sentenced in North Carolina and begin his sentence even
before he was returned to Pennsylvania to face new charges.  In
other words, the North Carolina sentence could not be imposed to
run concurrently with an Pennsylvania sentence simply because there
could be no Pennsylvania prosecution until after the case in North
Carolina was completed.

For all of these reasons, the government respectfully submits that the defendant's Motion to Dismiss for a Double Jeopardy Clause Violation should be denied.

Respectfully submitted

MARY BETH BUCHANAN
United States Attorney


s/ Gregory J. Nescott
GREGORY J. NESCOTT
Assistant U.S. Attorney
PA ID No. 27331
U.S. Attorney's Office
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
Office: 412-644-3500
Fax: 412-644-2645
gregory.nescott@usdoj.gov