**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **2:00cr54** |
| | ) | **Electronic Filing** |
| DAVID MAIS | ) | |

## MEMORANDUM AND ORDER OF COURT

On March 28, 2000, a grand jury returned a fourteen count indictment against David Mais ("defendant") charging him at Count One with conspiring, from in or around 1994 and continuing thereafter to in or around March 1997, to distribute and posses with the intent to distribute in excess of 50 grams of cocaine base, in the form commonly known as crack, and in excess of 500 grams of cocaine, in violation of 21 U.S.C. § 846; at Count Two with distributing and possessing with intent to distribute in excess of 50 grams of cocaine base, in the form commonly known as crack, on or about February 20, 1997, in violation of 21 U.S.C. §§ 841(a) (1) and 841(b) (1) (A) (iii); at Count Three with conspiring, from in or around January 1994 and continuing to in or around March 1997, to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, through the use of Western Union wire transfers involving the proceeds of a specified unlawful activity, that being illegal drug trafficking, in violation of 18 U.S.C. § 1956(h); and at Counts 4 through 14 with knowingly conducting and attempting to conduct financial transactions affecting Interstate Commerce, that being the transmission of Western Union wire transfers on specified dates from April 24, 1995, through March 5, 1997, which transfers involved the proceeds of illegal drug trafficking, with each count reflecting the date, amount and Western Union wire transaction number, in violation of 18 U.S.C. § 1956(a) (1) (B) (i). Presently before the court are defendant's (1) motion for discovery; (2) motion for a bill of particulars; (3) motion to disclose and exclude evidence of uncharged misconduct; (4) motion to dismiss for prejudicial pre-indictment delay; and (5) motion to dismiss for violation of due process, right to a speedy trial, and double jeopardy. The government

has filed an omnibus response to the motions. The motions are addressed below.

Defendant requests disclosure of a wide array of information prior to trial. The requests include information falling within the scope of Rule 16 of the Federal Rules of Criminal Procedure as well as various forms of information falling within the scope of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. In response, the government notes its obligation to produce all materials within the ambit of Rule 16, which includes any written or recorded statements by defendant and any oral statements by him to a person then known to be a government agent; defendant's prior criminal record; all documents and tangible objects within the government's possession, custody or control that are material to the preparation of the defense or are intended to be used by the government as evidence in chief at trial, or were obtained from or belong to the defendant; the results of any reports or physical or mental examinations or other types of scientific tests which are material to the defense or intended to be used by the government as evidence in chief at trial; and a written summary of any expert testimony the government intends to use during its case-in-chief. It also notes its obligations under Brady, including its duty to disclose exculpatory material without delay and its duty to disclose Brady impeachment material. The government requests leeway to disclose such impeachment material along with all Jencks Act material, which it has voluntarily agreed to make available one week prior to trial. Within these confines the government indicates it either has no information responsive to defendant's specific requests or it will produce the requested information one week prior to trial.

Beyond the above areas, the government specifically objects to (1) defendant's request for a list of cases and investigations in which a prospective government witness or informant who will not be called as a witness previously has cooperated and any criminal filing resulting from that cooperation, and (2) defendant's requests for the criminal records of informants, unindicted co-conspirators and any other non-witnesses. These requests will be denied for a number of reasons.

2

First, the government has acknowledged its obligations under Rule 16 and indicated its intent to comply with those obligations fully. Rule 16 was not designed to provide a defendant with a vehicle to discover the government's case in detail or the strategy it intends to pursue at trial. United States v. Fioravanti, 412 F.2d 407, 410 (3d Cir.), cert. denied, 396 U.S. 837 (1969). Nor is the rule designed to provide a defendant with verification that the use of anticipated evidence at trial by the defense is not vulnerable to attack by evidence within the government's possession. United States v. Randolph, 456 F.2d 132, 136 (3d Cir.), cert. denied, 408 U.S. 926 (1972). In fact, in sharp contrast with these propositions, the United States Court of Appeals for the Third Circuit has recognized that discovery in criminal cases is limited to those areas delineated in Rule 16, "with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." United States v. Ramos, 27 F.3d 65, 67-68 (3d Cir. 1994). As a general matter these other areas are limited to the Jencks Act and materials available pursuant to the so-called "Brady doctrine." Id. at 68.

Second, the government has no obligation to produce an outline of the evidence it will use at trial. A defendant is not entitled to conduct a wholesale review of the government's investigation. See Weatherford v. Bursey, 429 U.S. 545, 559 (1977) (there is no general constitutional right to discovery in a criminal case). Nor is a defendant entitled to obtain a list of the government's witnesses through discovery. See United States v. DePasquale, 740 F.2d 1282, 1294 (3d Cir. 1984), cert. denied, 469 U.S. 1228 (1985). Similarly, there is no authority to support a defendant's request for the specifics of each government witness' proposed testimony. See Fioravanti, 412 F.2d at 410 (a defendant has no right to discover the minutia of the government's evidence or the manner in which it will be used). And even assuming arguendo that this court has some residual discretion to order the pretrial disclosure of the government's evidence in appropriate circumstances, the current record falls woefully short of presenting sufficient grounds to justify such an extraordinary measure.

Finally, "the statements of co-conspirators, whether indicted or not, are not available to

3

the defendant under Rule 16." 8 J. Moore, Moore's Federal Practice, ¶ 16.04[1], 16-64. Every

circuit court to address the issue has held that such statements are not discoverable under Rule 16

and that disclosure of such statements is governed by the Jencks Act, regardless of whether the

co-conspirator will be called as a witness. See United States v. Tarantino, 846 F.2d 1384, 1418 (

D.C. Cir.), cert. denied, 488 U.S. 840 (1988); United States v. Roberts, 811 F.2d 257, 258 (4th

Cir. 1987) (en banc); United States v. Diaz, 834 F.2d 287 (2d Cir. 1987), cert. denied, 488 U.S.

817 (1988).    These courts have reasoned that disclosure of such statements is governed by the

Jencks Act because the government must present some witness who will testify to the

unavailable co-conspirator's statements.    Accordingly, to the extent the defendant requests

pretrial disclosure of all unindicted co-conspirators through the identification of prior criminal

records, the request must be denied.[1]

Another area remaining in dispute concerns the potential disclosure of impeachment

material.    As a general matter, a defendant's requests for impeachment material such as the

criminal records of and promises or inducements made to prospective government witnesses

raise issues under Brady and the Jencks Act.[2]    In Brady v. Maryland, 373 U.S. 83 (1963), the

Supreme Court held that due process requires the disclosure of "evidence favorable to an accused

upon request . . . where the evidence is material either to guilt or to punishment, irrespective of

the good faith or bad faith of the prosecution." Id. at 87.    The Supreme Court subsequently held

that evidence which may be used to impeach the testimony of a government witness falls within

the ambit of Brady when the credibility of the witness may have an effect on the jury's

---

[1]In contrast, to the extent the government has information that significantly undermines the truthfulness of a critical "non-witness," such information may well fall within the scope of Brady even though discovery of the specific statement itself is not immediately available.

[2]The Jencks Act provides that any statement or report made by a government witness which relates to the subject matter of the witness' testimony must be disclosed after the witness has testified under direct examination. See 18 U.S.C. § 3500 (b).    The government has indicated it intends to follow its customary practice in this district make such disclosures at least a few days before trial.

4

determination of guilt or innocence. See Giglio v. United States, 405 U.S. 150, 154 (1972; see also United States v. Starusko, 729 F.2d 256, 260 (3d Cir. 1984); United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994) (Brady material includes "materials that might affect the jury's judgment of the credibility of a crucial prosecution witness") (quoting United States v. Hill, 976 F.2d 132, 134-35 (3d Cir. 1992)). In United States v. Agurs, 427 U.S. 97, 107 (1976), the Supreme Court modified the Brady rule to require the government to disclose exculpatory evidence even when the defendant has not requested the information. Id. at 107; see also United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991).

The so-called Brady doctrine generally is understood as a rule of minimum fairness. United States v. Higgs, 713 F.2d 39, 42 (3d Cir. 1983), cert. denied, 464 U.S. 1048 (1984). It establishes a prosecutorial obligation rather than a general rule of pretrial discovery. The government thus has an obligation to produce favorable material bearing on a defendant's culpability or punishment as well as material bearing on the credibility of any witness who will be used to establish material matters at trial. This obligation is not to be used, however, to permit a defendant to obtain wholesale discovery of the government's principal case. See Higgs, 713 F.2d at 42; United States v. Bocra, 623 F.2d 281, 285 (3d Cir. 1980).

It is well-settled that the government's obligations under Brady require it to disclose actual exculpatory evidence without undue delay. Brady impeachment material ordinarily must be disclosed "in time for its effective use at trial." Higgs, 713 F.3d at 44; United States v. Blackwell, 954 F. Supp. 944, 968 (D.N.J. 1997). A district court has general discretionary authority to order the pretrial disclosure of Brady impeachment material and that discretion is to be exercised in a manner which "ensure[s] the effective administration of the criminal justice system." Government of Virgin Islands v. Martinez, 847 F.2d 125, 127 (3d Cir. 1988); Blackwell, 954 F. Supp. at 968. As to this material, the government requests leeway to turn such material over when it produces its Jencks Act material, one week prior to trial.

While the court recognized in Higgs that a defendant's due process rights to a fair trial are

5

not violated where the disclosure of <u>Brady</u> impeachment material occurs in time to be used effectively, subsequent cases by the Third Circuit have reiterated and encouraged adherence to the long-standing policy of promoting the early production of all types of <u>Brady</u> material, including impeachment and so-called <u>Higgs</u> materials.  See <u>Starusko</u>, 729 F.2d at 261 (<u>citing</u> <u>United States ex rel. Marzeno v. Gengler</u>, 574 F.2d 730, 739 (3d Cir. 1978); <u>United States v. Kaplan</u>, 554 F.2d 577, 578 (3d Cir. 1977)); <u>see also</u> <u>United States v. Giampa</u>, 904 F. Supp. 235, 281 (D.N.J. 1995); <u>Blackwell,</u> 954 F. Supp. at 968.  While the government's production of <u>Higgs</u>-type impeachment material may well overlap with its production under the Jencks Act and provide defendant with advance notice of certain witnesses the government intends to use at trial, the court notes that after disclosure is made defense counsel can more fully advise his client regarding the appropriate development of the case, including consideration of any plea agreement offered by the government.  In light of all of the circumstances, the government is encouraged to disclose all such material without further delay, and in any event it will be ordered to produce all <u>Brady</u> impeachment material no later than ten calendar days prior to trial.[3]

Defendant also requests timely notice of any prior bad acts the government intends to introduce pursuant to Rule 404(b).  The government indicates it does not intend to seek to introduce any evidence of the defendant's prior arrests or convictions and its remaining evidence is either intrinsic to the conspiracy it will prove at trial or is essential to explaining the relationship between defendant and any testifying co-conspirators.  The government considers all

---

[3]Of course, this ruling has no bearing on the government's disclosure of information that falls solely under the Jencks Act.  It is well-settled that the plain language of the Jencks Act precludes a court from compelling the disclosure of Jencks Act material prior to the completion of a government witness' testimony on direct examination.  See United States v. Hill, 976 F.2d 132, 140 (3d Cir. 1992); United States v. Murphy, 569 F.2d 771, 773 (3d Cir.), cert. denied, 435 U.S. 955 (1978).  Although courts lack the authority to order the early disclosure of Jencks material, the Third Circuit nevertheless has endorsed the prevailing practice of the government to disclose Jencks material prior to trial.  See Murphy, 569 F.2d at 773; Hill, 976 F.2d at 140.  The government is encouraged to follow its customary practice in this jurisdiction and disclose all remaining Jencks material at least three business days prior to trial.

of its evidence concerning defendant's criminal conduct after the alleged commencement of the
conspiracy in "approximately August 1996" to be intrinsic to the charged conspiracy and
therefore beyond the purview of Rule 404(b).

The distinction between intrinsic and extrinsic evidence is well recognized in criminal
cases charging a conspiracy. See e.g. United States v. Costa, 691 F.2d 1358 (11th Cir. 1982);
United States v. Conley, 878 F. Supp. 751, 754 (W. D. Pa. 1994) (J. Lee).  In Conley, Judge Lee
described the intrinsic/extrinsic distinction as follows:

> The distinction between evidence of "intrinsic" acts and
> evidence of "extrinsic" acts is crucial and sometimes subtle.
> Rule 404(b) only applies to evidence extrinsic to the charged
> crime. United States v. Record, 873 F.2d 1363, 1372 n.5 (10th
> Cir. 1989).  Conversely, acts intrinsic to the crimes charged are
> not excludable under 404(b).  An uncharged act may not be
> extrinsic if: (1) the act was part of the scheme for which a
> defendant is being prosecuted; Record, 873 F.2d at 1372 n.5
> or (2) the act was "inextricably intertwined with the charged
> crime such that a witness' testimony 'would have been confusing
> and incomplete without mention of the prior act.'" Record, 873
> F.2d at 1372 n. 5 ("quoting United States v. Richardson, 764 F.2d
> 1514, 1521-22 (11th Cir.) cert. denied, 474 U.S. 952 (1985)).
> See United States v. Williams, 900 F.2d 823, 825 (5th Cir.
> 1990) ("Other act evidence is intrinsic when the evidence of
> the other act and the evidence of the crime charged are
> inextricably intertwined or both acts are part of a single criminal
> episode or the other acts were necessary preliminaries to the
> crime charged.") (citations omitted).

Conley, 878 F. Supp. at 754.  Other courts within the Third Circuit likewise have followed this
distinction. See United States v. Ramos, 971 F. Supp. 186, 191 (E.D. Pa. 1997) ("also
instructive are the analogous cases in which courts have held that Rule 404(b) limits the
admission of other acts extrinsic to the ones charged but that acts intrinsic to the charged crime
are not proscribed by Rule 404(b).").

Because defendant has been charged with a drug conspiracy dating back to 1994, which
the government subsequently has indicated will be limited to the fall of 1996 and the spring of
1997, the court  will recognize the intrinsic/extrinsic distinction where the proffered evidence
sufficiently appears to be part of the agreement for which defendant is being prosecuted or is

inextricably intertwined with the charged offense.

To the extent the government has evidence that is not clearly intrinsic to the charged conspiracy as subsequently delineated, then the government is required to give notice of its intention to use Fed. R. Evid. 404(b) evidence prior to trial. Rule 404(b) specifically provides "that upon request by the accused the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any evidence it intends to introduce at trial."

The rule requires only the disclosure of the general nature of the evidence the government intends to introduce. A demand for specific evidentiary detail, such as dates, times, places and persons involved is overly broad. See United States v. Alex, 791 F. Supp. 723 (N.D. Ill. 1992). Thus the disclosure of "the general nature" of such evidence is that which is sufficient to put a defendant on notice as to which of his or her past episodes of conduct may be used by the government at trial.

What constitutes "reasonable notice in advance of trial" is determined by the circumstances and complexity of the prosecution. In Alex, the court ordered disclosure of Rule 404 (b) evidence seven days prior to trial. In contrast, the court in United States v. Williams, 792 F. Supp. 1120, 1133 (S.D. Ind. 1992), noted generally that disclosure within ten days prior to trial constitutes reasonable advanced notice. Similarly, in United States v. Evangelista, 813 F. Supp. 294, 302 (D.N.J. 1993), the court ruled that disclosure ten business days prior to trial is sufficient notice. Several courts of appeals have upheld similar rulings. See United States v. Kern, 12 F.3d 122, 124 (8th Cir. 1993) (fourteen day notice held reasonable under Rule 404(b)); United States v. Perez-Tosta, 36 F.3d 1552, 1560-63 (11th Cir. 1994), cert. denied, 515 U.S. 1145 (1995) (six business days deemed adequate); United States v. French, 974 F.2d 687, 694-95 (6th Cir. 1992) (one week notice in narcotics prosecution upheld as valid exercise of discretion).

Here, the rule provides defendant with the right to formal notice of all potential Rule 404(b) evidence which the government intends to introduce at trial. Accordingly, the court will grant the defendant's Rule 404(b) motion and direct the government to provide the required

8

general notice no later than ten calendar days prior to trial.

Defendant moves to dismiss the indictment on the ground of prejudicial pre-indictment delay. Specifically, defendant notes that the indictment is premised on an alleged course of conduct asserted to have occurred in or around 1994 to in or around March 1997, and the indictment was not returned until March 28, 2000, some three years after the end of the alleged conspiracy and even longer from time when the government began it's investigation. Defendant asserts that his Fifth Amendment right to a fair trial has been substantially prejudiced by this delay and the prosecution has gained a tactical advantage because he will now have to attempt to locate witnesses, who may not be available or may have faded recollections about events which occurred many years ago. In addition, defendant alleges that the delay may well effect his ability to locate records and information material to his defense.

Defendant requests the ability to supplement this motion after he has had an opportunity to review all documentary evidence produced by the government and locate his prospective witnesses. The government contends that defendant will be unable to meet his burden of proof in any event, and therefore the "extreme sanction" of dismissal is not warranted.

In general, the statute of limitations provides the primary safeguard against the initiation of stale criminal charges. See United States v. Lovasco, 431 U.S. 783, 789 (1977); United States v. Marion, 404 U.S. 307, 322 (1971); United States v. Ismaili, 828 F.2d 153, 157 (3d Cir. 1987). Where an indictment is returned within the limitations period, it may be dismissed only if delay sufficiently oppressive to violate the Due Process Clause is present. Lovasco, 431 U.S. at 789; Marion, 404 U.S. at 324. To establish this type of delay, the defendant bears the burden of proving two essential facts: "(1) that the government intentionally delayed in bringing the indictment in order to gain some advantage over him, and that (2) this intentional delay caused the defendant actual prejudice." Ismaili, 828 F.2d at 167 (citing Marion, 404 U.S. at 325). The defendant must be able to satisfy both prongs of this standard before the sanction of dismissal is warranted . United States v. Sebetich, 776 F.2d 412, 430 (3d Cir. 1985).

9

Defendant has failed to identify any potential basis for a finding of actual prejudice. He does not point to specific items of evidence or documents that have been lost, witnesses that are unavailable, or to witness recollections that have faded as a result of the thirty-six month delay between March of 1997 and the return of the indictment of March 28, 2000. See Marion, 404 U.S. at 325-26 (appellee failed to demonstrate thirty-eight month delay resulted in dimmed memories, unavailable witnesses or the destruction of evidence); United States v. Beckett, 208 F.3d 140, 151 (3d Cir. 2000) (defendant failed to show actual prejudice from six month delay by identifying evidence or documents that were lost, witnesses that became unavailable, or recollections that had faded). The lack of any showing of actual prejudice is fatal to defendant's motion.

But even assuming, however, that defendant may be able to identify the loss of evidence as a result of the thirty-six month delay in question, there is no basis to assume that defendant will be able to prove that the federal government caused the delay deliberately to gain some improper advantage. "The Due Process Clause does not require prosecutors to file charges as soon as probable cause exists, or even at the point where the government's investigation, though incomplete, has assembled sufficient evidence to prove guilt beyond a reasonable doubt." Beckett, 208 F.3d at 151. And the mere delay between the uncovering of defendant's criminal conduct in the spring of 1997 and the return of the indictment on March 28, 2000, is not in itself a basis for finding intentional delay.

"It is well-settled that prosecutors enjoy broad discretion in determining when to seek an indictment and that this discretion empowers prosecutors to delay obtaining an indictment for investigative purposes." United States v. Baxt, 74 F. Supp 2d 425, 429 (D. NJ. 1999). And this discretion extends to delaying the return of the indictment even after a prosecutor has assembled sufficient evidence to prove guilt beyond a reasonable doubt. Id. (citing Lovasco, 431 U.S. at 792-96). Avoiding intrusion into this area of broad discretion precludes the imposition of undue pressure to "resolve doubtful cases in favor of early and possibly unwarranted prosecution" and

10

serves the goal of permitting the "government to give full consideration to the desirability of not prosecuting in particular cases." Id. (quoting Lovasco, 431 U.S. at 793-94). " To impinge on the discretion of prosecutors to delay an indictment to investigate more fully the merits of filing formal charges would 'subordinate the goal of orderly expedition to that of mere speed.'" Id. (quoting Lovasco, 431 U.S. at 795 and Ismaili, 828 F.2d at 168).

The government has proffered the following information to explain the thirty-six month delay in question. On March 6, 1996, defendant was indicted along with several other co-defendants in the Western District of North Carolina pursuant to an eleven count indictment ("the North Carolina indictment"). Defendant, Tabon Clinder Howze and David Gauland Smith were charged at count one with conspiring to possess with the intent to distribute and distributing cocaine and cocaine base, from in or around the Spring of 1994 continuing "to the present [March 6, 1996]" in the Western District of North Carolina and elsewhere. This indictment followed the arrests in North Carolina and Baltimore of several drug couriers as they arrived on flights from Jamaica on September 1, 1995. Each of the defendants charged at Count One along with seven named couriers were charged at Count Two with conspiring to import cocaine and cocaine base into the United States, in violation of 21 U.S.C. § 963. Counts Three through Ten charged defendant and Howze along with the couriers with possession with intent to distribute cocaine and cocaine base on one of three specified dates: July 15, 1995, August 17, 1995, and September 1, 1995. Count Eleven contained forfeiture allegations. Defendant was arrested on these charges in Pittsburgh on March 6, 1997, as a result of the events discussed below.

On February 11, 1997, Jason Evans ("Evans") was arrested in the Western District of Pennsylvania for possessing with intent to distribute in excess of one-half kilogram of crack cocaine. He immediately agreed to cooperate and named defendant as his source of supply.

Evans indicated defendant had returned from a trip to Jamaica in August of 1996 and began supplying him with quantities of crack and powder cocaine at that time. Wearing an electronic recording device, Evans met with defendant on February 15, 1997, and paid him

11

$2,000 that was owed from the half-kilogram that previously had been seized. On February 20, 1997, Evans met with defendant at his residence and made a controlled purchase of nine ounces of crack. Evans gave defendant $5,000 in marked, serialized currency as part of the transaction. Thereafter, additional recorded meetings and conversations occurred between Evans and defendant, and surveillance officers observed at least one of those meetings.

Defendant advised Evans on March 4, 1997, that he was expecting a ten-kilogram shipment of cocaine from a source of supply in Atlanta. Evans paid defendant $1,000 for crack he had received in February. Evans gave defendant an additional $2,000 on March 5, 1997. The agents working with Evans received a copy of the North Carolina indictment on that same day along with a request to arrest defendant.

On March 6, 1997, defendant was arrested at the home of his girlfriend, Pam Latimer, at 439 Sapphire Way, Pittsburgh, PA. At that time searches were conducted at Latimer's address as well as defendant's apartment at 5500 Margaretta Street, No. 206, Pittsburgh, PA. Drug packaging materials, scales, cutting agents, pots used for cooking crack and over $70,000 were seized. Included in the cash was $7,690 of the serialized currency defendant received from Evans.

After being arrested defendant denied that he had been dealing drugs in the recent past and asserted that he had let individuals cook crack cocaine at his Margaretta Street apartment for a $1,000 fee. On March 7, 1997, defendant appeared before a magistrate judge in Pittsburgh for detention and removal hearings and was ordered removed to the Western District of North Carolina.

At the time of defendant's initial appearance he was advised that he would face an indictment in the Western District of Pennsylvania on charges arising out of the 1997 sales he had made to Evans. Thereafter, defendant indicated that he wanted to cooperate in the Western District of Pennsylvania and desired to plead guilty to the North Carolina indictment along with any new charges in Pittsburgh. Defendant's then counsel, Larry Victum, Esquire, filed motions

12

seeking to postpone defendant's removal to the Western District of North Carolina during the course of defendant's cooperation in this district. The motions were granted on March 14, 1997, and June 25, 1997.

Defendant sat for a series of debriefings with agents which occurred on March 6, 1997, April 16, 1997, May 1, 1997, May 20, 1997 and June 16, 1997. During these debriefings an anticipated upcoming grand jury appearance by defendant in the Western District of Pennsylvania in August or September of 1997 was discussed as well as the government's anticipated filing of crack cocaine charges here, once the North Carolina indictment was transferred to this district.

During the debriefings defendant offered information about Jamaican and non-Jamaican drug traffickers operating in the Western District of Pennsylvania, including several significant targets whom the government thought could be indicted with defendant's cooperation and testimony. On April 24, 1997, defendant consented to the transfer of the North Carolina indictment to this district and discussed pleading guilty to an information in the Western District of Pennsylvania on the Evans crack sales.

Defendant signed a plea agreement on the North Carolina charges on June 20, 1997, which was filed in that district along with Rule 20 paperwork executed to effectuate the transfer of those charges to this district. Pursuant to that agreement, defendant agreed that he was accountable for the distribution of at least five hundred grams but fewer than 2 kilograms of powder cocaine. In exchange, the United States Attorney for the Western District of North Carolina agreed to recommend that any sentence that defendant received on the North Carolina charges run concurrent to any sentence imposed on the charges to be brought in the Western District of Pennsylvania. A change of plea hearing was scheduled in this district for September 5, 1997, before the Honorable Gary Lancaster. On August 9, 1997, defendant authored a letter to the government indicating he believed he had been "misled into signing" the plea agreement, he was "not guilty of the charges" and he had decided he wanted to "face my accusers" on the North

13

Carolina charges.  On September 5, 1997, defendant and his counsel met with the Assistant
United States Attorney assigned to the case in this district and advised that defendant wanted to
end his cooperation, return to North Carolina to fight the indictment, and cancel his scheduled
appearance before a grand jury in Pittsburgh.  On September 5, 1997, defendant appeared before
Judge Lancaster on his scheduled change of plea hearing and advised the court he no longer
wanted to plead guilty.  Judge Lancaster vacated the Rule 20 consent to transfer and ordered the
indictment and defendant returned to the Western District of North Carolina.

    On February 26, 1998, an amended plea agreement between the United States and
defendant was filed in the Western District of North Carolina.  On that date defendant entered a
plea of guilty in North Carolina to Count One of the indictment and on October 28, 1998,
defendant was sentenced to forty-one months of imprisonment.

    On February 22, 1999, agents visited defendant in federal prison in Elkton, Ohio, and
secured handwriting exemplars from him.  These were obtained in conjunction with an
investigation into numerous wire transfers believed to be linked to defendant's drug trafficking
activities.  The results of the handwriting analysis were reported to the government on July 13,
1999.

    The instant indictment was returned on March 28, 2000.  A detainer was then lodged with
the Bureau of Prisons.  At that juncture the government learned that defendant had been released
from the Bureau of Prisons to the Immigration and Naturalization Service pursuant to a detainer
previously lodged against defendant.[4]   Defendant was deported to Jamaica on March 23, 2000,
five days prior to the instant indictment being returned.

    Inevitably an arrest warrant was issued for defendant in this district.  Defendant traveled
to Toronto, Canada, in April of 2006 to visit family.  After the visit, defendant attempted to
return to Jamaica.  During the return trip defendant was arrested pursuant to the pending

---

[4]Defendant entered the United States illegally in 1988, and was arrested and released on bond in
1993 by immigration authorities, pending a hearing.  Defendant failed to appear for a deportation
hearing on March 30, 1993, and was ordered deported in abstencia.

14

warrant. In May of 2006, defendant waived extradition and was returned to this district, making his initial appearance on June 16, 2006.

As is evident from a review of the events outlined above, there is nothing to suggest that the government intentionally delayed the securing of an indictment in order to gain a tacticle advantage over defendant. To the contrary, defendant's decision to abandon his cooperation in September of 1997 left the United States with a decision regarding what charges would be initiated against defendant in the Western District of Pennsylvania. The government was still in the process of gathering information to inform its decision as late as July 13, 1999. The indictment was returned a mere eight months later. Under these circumstances there is simply no basis upon which to predicate a finding that the government has engaged in improper delay.

Defendant moves for a bill of particulars, contending that he is unable to ascertain the nature of the case against him from the face of the indictment. Defendant requests specific information regarding the dates on which he allegedly possessed cocaine with the intent to distribute it and any conduct by him which the government will rely on to support its allegations. Among other things, defendant requested the dates, times, and places of any acts or statements by the defendant and the names and addresses of any witnesses thereto, and the identification of and information regarding each specific act or statement of a co-conspirator that the government may seek to impute to defendant. With regard to the conspiratorial agreement, the defendant requests a variety of information including the specific details of the evidence that will be used to prove defendant's membership in the alleged agreement, the dates, places, and individuals allegedly connected to defendant's participation in the agreement, the nature and purpose of any acts by co-conspirators, the first and last acts by defendant manifesting his participation in the conspiracy and the identification of all unindicted co-conspirators.

The government contends defendant essentially is using the motion as a means to obtain general discovery and defendant has failed to demonstrate that a bill of particulars is warranted. Specifically, the government notes that defendant has obtained a variety of material outlining the

15

particulars of the conspiracy charged in Count One and this information is sufficiently particular to permit defendant to conduct his own investigation into that charge.

A bill of particulars should be granted when the indictment is so vague that it fails to advise the defendant of the nature of the charges. United States v. Addonizio, 451 F.2d 49 (3d Cir.), cert. denied, 405 U.S. 936 (1972). In Addonizio, the Third Circuit set forth three general scenarios where a bill of particulars is appropriate: (1) to inform the defendant of the nature of the charges being brought against him so that he may adequately prepare his defense; (2) to avoid undue surprise at trial; and (3) to protect against double jeopardy because of an inadequately described offense. Addonizio, 451 F.2d at 63-64. In other words, a bill of particulars may be used to inform the defendant of the nature of the charges so that he or she may prepare an adequate defense, avoid surprise during trial and protect against any potential second prosecution for the same offense. United States v. Rosa, 891 F.2d 1063, 1065 (3d Cir. 1989). "In ascertaining whether a bill of particulars is appropriate, the court may consider not only the indictment, but also all the information which has been made available to the defendant." United States v. Fischbach & Moore, Inc., 476 F. Supp. 1384, 1389 (W.D. Pa. 1983) (citing United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir.), cert. denied, 409 U.S. 914 (1972)).

The record provides defendant with the particulars of the offense in more than sufficient detail. First, the indictment identifies the nature of the alleged offense, the controlled substances purportedly distributed, the minimal amounts involved in the transactions and the federal law allegedly violated. Second, defendant has been provided with additional details of the offense through the government's disclosures to date. The government indicates it will seek to prove that defendant entered into a conspiracy a number of months after the North Carolina indictment was returned on March 6, 1996. That indictment charged defendant's participation in an importation and distribution conspiracy beginning in the Spring of 1994 and continuing through the date the indictment was returned. Notwithstanding the fact that the North Carolina indictment charged that the conspiracy therein continued until March 6, 1996, the government will seek to prove in

16

this prosecution that the conspiracies charged therein collapsed by September of 1995, when the drug carriers attempting to smuggle cocaine into the United States from Jamaica were intercepted and arrested in North Carolina. Notwithstanding this collapse of the importation scheme, the government indicates it will not introduce into the instant prosecution proof of drug distribution prior to March 6, 1996. Instead, it will rely on the crack and cocaine sales made to Evans beginning in or around August of 1996 and continuing until March of 1997.

In support of its theory, the government has provided defendant with detailed Pennsylvania State Police reports outlining defendant's receipt from Evans of a $2,000 payment for the delivery of the one-half kilogram of cocaine apprehended from Evans; the controlled and tape-recorded delivery on February 20, 1997, of nine ounces of crack cocaine to Evans in exchange for $5,000; and defendant's arrest and the subsequent searches on March 6, 1997. In addition, defendant has received a copy of the affidavit used to obtain the search warrant executed on March 6, 1997, at defendant's Pittsburgh address. The affidavit contains specific details pertaining to how and when defendant and Evans began a series of drug transactions in February of 1997. Beyond the above, defendant also has received reports of his cooperating interviews in 1997, copies of the recorded conversations with Evans, and oral outlines of the details of the evidence the government intends to offer in support of Count One.

The above information, in conjunction with the Rule 16 material already disclosed to defendant, more than adequately provides the particulars of the conspiratorial agreement which the government will seek to prove at trial. Accordingly, the government's prosecution at Count One will be limited in scope to its representatives in response to defendant's motion and defendant's motion for a bill of particulars will be denied.

Finally, defendant has filed a "motion to dismiss indictment in violation of defendant's right to due process, defendant's right to a speedy trial, and for being placed twice in jeopardy." In support defendant contrasts the charges in the North Carolina and Pennsylvania indictments. He further notes that he was debriefed on a number of occasions following his arrest on the North

17

Carolina indictment, entered into a plea agreement that committed the government to recommend that any sentence on the North Carolina charges be made to "run concurrently with the sentence received in Pittsburgh, Pennsylvania," and received a sentence in North Carolina based on relevant conduct that included reference to "defendant's dealings with Evans in Pittsburgh in February and March of 1997."

In general, defendant contends that the United States was fully aware of the information utilized to secure the Pennsylvania indictment at the time the North Carolina case was adjudicated and alleges that "there was an overlapping of information utilized by the government to assert the existence of respective North Carolina and Pittsburgh conspiracies." Defendant asserts that he has been denied due process by the government's delay in seeking the Pennsylvania indictment, the overlapping facts between the two indictments, and his deportation just prior to the return of the Pennsylvania indictment.

Defendant specifically notes that he is protected under the Double Jeopardy Clause of the Fifth Amendment from both successive prosecutions and multiple punishments from the same criminal offense. See North Carolina v. Pearce, 395 U.S. 711, 717 (1976). This constitutional protection precludes the government from dividing "a single criminal conspiracy into multiple violations of the conspiracy statute." United States v. Thomas, 759 F.2d 659, 661 (8th Cir. 1985) (citing Braverman v. United States, 317 U.S. 49, 52-53 (1942)). Based on the overlapping nature of the two indictments, defendant requests this court to review "the totality of the circumstances" and determine whether the two conspiracies are not simply different faces of the same unlawful agreement.

After outlining the events connected to defendant's prosecution on the North Carolina indictment, the government contends that the instant prosecution will prove a conspiracy between defendant, Evans and others to distribute crack and powder cocaine in the Western District of Pennsylvania that is distinct and separate from the smuggling/importation and distribution conspiracy charged in the North Carolina indictment. While conceding that the two conspiracies

18

may well appear in the first instance to contain overlapping proof, the government asserts they are distinct in time, overt acts, location and participants. Thus, it contends that defendant is not being prosecuted a second time for the "same offense."

The Double Jeopardy Clause of the Fifth Amendment prohibits successive prosecutions for the "same offense." Brown v. Ohio, 432 U.S. 161, 165 (1977). "Because the Double Jeopardy Clause bars successive prosecution for the same offense, it forbids 'the division of the single criminal conspiracy into multiple violations of a conspiracy statute.'" United States v. Cole, 293 F.3d 153, 158 (4th Cir. 2002) (quoting United States v. McDougal, 790 F.2d 1135, 1144 (4th Cir. 1986)).

"To support a double jeopardy claim, a defendant must show the multiple charges reflect the same offense, both legally and factually." United States v. Aguilera, 179 F.3d 604, 607 (8th Cir. 1999) (quoting United States v. McDougal, 133 F.3d 1110, 1113 8th Cir. 1998)). When raising such a claim, the defendant has the initial burden to make a non-frivolous claim of double jeopardy. Id. (citing United States v. Okolie, 3 F.3d 287, 289 (8th Cir. 1993); United States v. Doyle, 121 F.3d 1078, 1089 (7th Cir. 1997)). Once this prima facia showing is made, the burden shifts to the government to demonstrate, by a preponderance of the evidence, that the two indictments charge separate offenses. Doyle, 121 F.3d at 1089; Aguilera, 179 F.3d at 607.

Substantively, it is often difficult to determine if prosecutions of the same offense have occurred, particularly where the analysis involves "multi-layered conduct such as conspiracy, which expands over time and place." Doyle, 121 F.3d at 1089 "This is so because it is hard to apply the double jeopardy concept of finality to crimes 'which have no easily discernable boundaries with regard to time, place, persons, and objectives.'" Id. (quoting United States v. Thorton, 972 F.2d 764, 765 (7th Cir. 1992)).

The determination of whether two charged conspiracies actually reflect the same offense for double jeopardy purposes is based on "the totality of the circumstances." Doyle, 121 F.3d at 1090; United States v. Alvarado, 440 F.3d 191, 198 (4 th Cir. 2006), Aguilera, 179 F.3d at 607.

19

Five general factors are considered:

> (1)     the time periods covered by the alleged conspiracies;
>
> (2)     the places where the conspiracies are alleged to have occurred;
>
> (3)     the persons charged as co-conspirators;
>
> (4)     the overt acts alleged to have been committed in furtherance of the conspiracies, or any other descriptions of the offenses charged which indicate the nature and scope of the activities being prosecuted; and
>
> (5)     the substantive statutes alleged to have been violated.

Alvarado, 440 F.3d at 198. "The test is a flexible one; some factors may be more important than others depending on the circumstances of the case." Id.

Defendant has made a initial non-frivolous showing of a potential double jeopardy violation. As specifically charged in the indictments, the time periods covered by the alleged conspiracies have significant overlap. Each indictment charges that the alleged conspiracy began in or around 1994, with the North Carolina conspiracy continuing until the indictment was returned in that district, March 6, 1996, and the Pittsburgh indictment continuing to in or around March 1997. In addition, the charge in each indictment was based in part on conduct that occurred in the Western District of Pennsylvania involving the distribution of crack and powder cocaine in violation of 21 U.S.C. § 846. Thus, the government bears the burden of demonstrating by a preponderance of the evidence that defendant is in fact is being prosecuted for separate offenses.

The government has met its burden to proceed with the prosecution. However, due to the potential overlap of proof at trial, the court's ruling will be entered without prejudice to reconsider the matter after the government has submitted it's case-in-chief.[5]

------------------------------------------------

[5]The potential for impermissible overlap arises from the following:  the North Carolina indictment specifically charged a conspiracy that was "continuing to the present" and the offense conduct reported in the presentence investigation report indicated (1) the investigation of the North Carolina charges had been "initiated by members of a organized crime drug enforcement task force operating in Pittsburgh, Pennsylvania," (2) the drug smuggling network centered in

The government contends it will be able to establish that the conspiracies are distinct in time. The North Carolina importation scheme assertedly ended by September of 1995, or no later than March 6, 1996, when the North Carolina indictment was returned. In contrast, the government represents that the instant prosecution will be limited to a conspiracy between defendant and Evans that formed in the fall of 1996 and continued into the early months of 1997. Thus, the time frames appear to be distinct.

Second, it appears that defendant's role in each agreement was different. Defendant's role in the instant conspiracy appears to be that of supplying Evans with crack cocaine for distribution on credit. In contrast, defendant admitted that during the time the couriers named in the North Carolina indictment were operating he was living in Jamaica. At that juncture his role in that agreement was to facilitate the couriers' visit to Montego Bay, assisted by associates in Pittsburgh such as Tabon Howze. When the carriers arrived in Montego Bay, defendant would transport them to their hotels, arrange for them to receive their cargo and transport them back to the airport. Thus, defendant's role in the North Carolina conspiracy was distinctly separate from defendant's subsequent activities in furtherance of maintaining a distribution network in Pittsburgh.

Furthermore, the remaining substantive drug trafficking counts of the North Carolina indictment centered around the acts of importation occurring in North Carolina. Specifically, Count Two charged an importation conspiracy in violation of 21 U.S.C. §963, Counts Three through Six charged defendant and Howze with unlawful possession with the intent to distribute through the aiding and abetting of couriers Debra Peoples, Leaford Owen Barnett and Jimeatta Nichols; and Counts Seven through Ten charged defendant and Howze with fraudulently and

---

Pittsburgh, (3) Evans was one of defendant's best customers, (4) after the February and early March transactions between defendant and Evans, a recorded conversation revealed that new couriers were soon to arrive with another shipment and defendant offered some of the shipment to Evans if he reduced his debt to defendant significantly, and (5) Tabon Howze and others were located in Pittsburgh during the course of the North Carolina conspiracy.

knowingly importing into the United States cocaine and cocaine base through the actions of the same couriers. In contrast, based on the government's representatives the instant conspiracy arises from supplying Evans with cocaine base commencing in September of 1996 and continuing through March of 1997. Defendant provided the crack cocaine to Evans on credit and obtained payment once the drugs had been sold in the Pittsburgh area. These transactions constituted violations of 21 U.S.C. §§ 841 (a)(1) & (b)(1)(A)(iii). Thus, the substantive drug offenses forming the objects of the alleged conspiracies will prove to be distinct.

In addition, the transactions between Evans and defendant occurred exclusively in Pittsburgh. No North Carolina co-conspirator was involved in the transactions. And while the government concedes that defendant and Evans did have a prior history of drug dealing, it is not seeking to prosecute any transactions between the two prior to September of 1996. Thus, the places, persons and overt acts involved appear to be distinct.

Finally, the remaining substantiative statutes alleged to have been violated are different. In contrast to the importation offenses charged in the North Carolina indictment, the Pittsburgh indictment charges defendant at Count Two with an unlawful distribution to Evans on February 20, 1997, in violation of 21 U.S.C. §§ 841(a) (1) & (b) (1) (A) (iii). In addition, Counts Three through Fourteen charge defendant with conducting financial transactions involving the proceeds of specified unlawful activity, in violation of 18 U.S.C. §§ 1956(h) & (a)(1) (B)(i). The North Carolina indictment did not charge defendant with unlawful distribution on February 20, 1997, nor did it charge defendant with any monetary transaction offenses. Thus, the substantive statutes alleged to have been violated in each indictment are different.

Based on the above, the government has met its burden of proving by a preponderance of the evidence that it will be able to establish that the conspiratorial agreement between Evans and defendant in the fall of 1996 and early months of 1997 was distinct and different from the smuggling/importation/distribution agreement charged in the North Carolina indictment. Defendant's role in the conspiracy charged in North Carolina was conducted from Montego Bay,

22

Jamaica, in 1994 and 1995, where he was residing, and involved assisting and supplying couriers that would be transporting cocaine into the United States through a port of entry in North Carolina. In contrast, by the government's present account the conspiratorial agreement underlying the Pittsburgh indictment involved transactions between defendant and Evans in the fall of 1996 and early months of 1997 undertaken to distribute crack cocaine in the Pittsburgh area. Thus, the record contains a sufficient basis upon which to permit the government to prove the conspiratorial agreements were separate and distinct. Nevertheless, given (1) the substantial similarity in the wording of the two conspiracy charges, (2) the substantial overlap of "the offense conduct" as reported in the North Carolina presentence investigation report with the government's anticipated evidence in support of the instant conspiracy, and (3) the government's concession that Evans and defendant had a prior history dating back to the early 1990's, the court will enter its ruling on defendant's motion without prejudice to renew after the government's case-in-chief out of an abundance of caution.

Moreover, even assuming for the purposes of argument that the court ultimately agrees that Count One impermissibly charges defendant with part of the same conspiratorial agreement charged in the North Carolina indictment, it does not follow that the entire indictment violates the Fifth Amendment. To the contrary, Counts Two through Fourteen charge defendant with substantive offenses that remain viable even if they reflect overt acts undertaken in furtherance of the conspiracy charged in the North Carolina indictment.

It is well-settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause. See United States v. Bennett, 44 F.3d 1364, 1371 (8th Cir. 1995) (citing Harris v. United States, 359 U.S. 19 (1959) and Gore v. United States, 357 U.S. 386 (1958)). And this is true even though the "single transaction" is a conspiratorial agreement. Id. (citing American Tobacco Co. v. United States, 328 U.S. 781 (1946)). As the court in Bennett explained:

> Although the government may not ordinarily separately prosecute a
> defendant for two conspiracies that are in reality the same conspiracy, or

23

> prosecute a defendant for a conspiracy or "transaction" that is part of a larger
> conspiracy, under the <u>Blockburger</u> test it is possible for a single criminal
> agreement or conspiracy to give rise to distinct offenses under specific,
> separate conspiracy statutes. <u>Phillips</u>, 664 F.2d at 1007. This is due, at
> least in part, to the fact that it is Congress that establishes and defines offenses.
> <u>Sanabria v. United States</u>, 437 U.S. 54, 69, 98 S. Ct. 2170, 2181, 57 L. Ed.2d
> 43 (1978). "Few, if any, limitations are imposed by the Double Jeopardy Clause
> on the legislative power to define offenses.... Once Congress has defined a statutory
> offense..., that prescription determines the scope of protection for a prior
> conviction or acquittal. Whether a particular course of conduct involves
> one or more distinct "offenses" ... depends on this Congressional choice.
> <u>Id</u>. at 69-70 .... Consequently, Congress may choose to punish two aspects
> of conspiratorial behavior without necessarily violating the Fifth Amendment.

<u>Bennett</u>, 44 F.3d at 1370. In other words, "the applicable rule is that where the same act or

transaction constitutes a violation of two distinct statutory provisions, the test to be applied to

determine whether there are two offenses, or only one, is whether each provision requires proof

of a fact which the other does not." <u>Id</u>. at 1371 (quoting <u>Albernaz v. United States</u>, 450 U.S. 333,

337 (1981)).

It is beyond question that the distribution offense charged in Count Two, the

conspiratorial agreement to launder monetary instruments charged in Count Three and the

monetary transactions charged in Counts Four through Fourteen are separate and distinct offenses

that require proof of a fact which the others do not. This is likewise true with regard to those

counts and (1) Count One and (2) all the counts charged in the North Carolina indictment.

Accordingly, Counts Two through Fourteen of the instant indictment cannot run afoul of the

Double Jeopardy Clause even if they are predicated on the same course of conduct underlying the

North Carolina indictment.

The remaining aspects of defendant's motion raise little pause for concern. To the extent

defendant notes that the 1997 crack sales to Evans was referenced within the offense conduct

section of the North Carolina presentence investigation report, the reference fails to support

defendant's arguments. The parties stipulated in the North Carolina proceeding that defendant

was accountable for the distribution of two kilograms of powder cocaine. Here, defendant is

charged with distribution of cocaine base, in a form commonly known as crack cocaine, a

distinctly separate substance. The amount of the charged distribution carries a mandatory minimum sentence that was not imposed as part of the North Carolina sentence. Thus, defendant's reference to the relevant conduct portion of the North Carolina presentence investigation report provides no support for his arguments.

Similarly, defendant's contention that he has now been deprived of the ability to receive a concurrent sentence on the instant charges is unavailing. Any such depravation is defendant's own doing. Defendant made an individual choice to do an about face and abandon his cooperation efforts in this District over the summer of 1997. At that juncture he understood that the proceedings in each district would no longer be coordinated and would advance separately. The repercussions of this personal choice cannot be converted to a detrimental depravation by the United States.

Finally, the record contains no basis to support defendant's contention that his rights to a speedy trial have been violated. Careful consideration of the issues raised by defendant demonstrates precisely the opposite. Accordingly, this basis for relief also is without merit.

In light of the above, the order set forth below is appropriate.

## ORDER OF COURT

AND NOW, this __30__ day of October, 2006, for the reasons set forth in the above memorandum, IT IS ORDERED as follows:

1) defendant's motion to disclose and exclude uncharged misconduct evidence (Doc. No. 22) be, and the same hereby is, granted in part. Consistent with the rulings set forth in the memorandum above, the government shall provide written notice of the general nature of any prior acts of misconduct governed by Rule 404(b) which it intends to offer at least ten calendar days prior to trial. The government's use of intrinsic evidence shall be limited as reflected in the court's rulings and analysis set forth above. The motion is denied in all other aspects;

2) defendant's motion for discovery (Doc. No. 22) be, and the same hereby is, granted in part. The government shall:

    a)    Abide by and comply with the representations in its response to defendants' motions in a timely manner;

    b)    Produce all Rule 16 and <u>Brady</u> exculpatory material forthwith;

    c)    Produce all <u>Brady</u> impeachment material no later than ten calendar days prior to trial; and

    d)    The government is encouraged to disclose its Jencks Act material in accordance with its representation that it will do so five business days prior to trial;

3) defendant's motion to dismiss for prejudicial pre-indictment delay (Doc. No. 20) be, and the same hereby is, denied; and

4) defendant's motion to dismiss for violation of due process, right to a speedy trial and being placed twice in jeopardy (Doc. No. 24) be, and the same hereby is, denied. This ruling is without prejudice to defendant's right to move for dismissal of Count One on double jeopardy grounds after the government has submitted its case-in-chief.

The motions are denied in all other aspects.

David Stewart Cercone
United States District Judge

cc:    Gregory J. Nescott AUSA

    John A. Knorr, Esquire
    1204 Frick Building
    437 Grant Street
    Pittsburgh, PA 15219